**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

HOPE ROMERO and EMILIO ROMERO,

        Plaintiffs,

v.                                         No. CIV 10-298 JCH/LFG

ROY CORDOVA and EMERICK PADILLA,
in their individual capacities,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Defendants' *Motion for Summary Judgment on the Basis of Qualified Immunity* (Doc. 21).  In an action filed pursuant to 42 U.S.C. § 1983, Plaintiffs Emilio Romero and Hope Romero, who are brother and sister, bring counts against Defendants, former Mora County Sheriff Roy Cordova and Deputy Americk Padilla,[1] for procedural due process violations, excessive force, unreasonable search and seizure, and violation of their right to equal protection under the laws, based on the Romero siblings' separate encounters with the Defendants.  The Court, having considered the motions, briefs, exhibits, and relevant law, and being otherwise fully informed, finds that Defendants' motion should be granted in part and denied in part.

## FACTUAL BACKGROUND

The facts in this case relate to four separate incidents involving (1) Hope Romero and Deputy Padilla; (2) Emilio Romero, Sheriff Cordova, and Deputy Padilla; and (3) and (4) Emilio

---

[1]Deputy Americk Padilla is apparently misidentified as Emerick Padilla in the caption.

Romero and Sheriff Cordova.

### *June 2009 Encounter Between Hope Romero and Deputy Padilla*

On the evening of June 9, 2009, Padilla was on duty at the Mora County Sheriff's Office when he received a request to locate Delilah Fresquez, a "female subject" (Doc. 21 at 12) in an ongoing criminal investigation involving a homicide, who had been stopped in her blue compact vehicle by another deputy and had fled the scene. While searching in the vicinity of Fresquez' home, Padilla and a ride-along officer, Michael May, located a woman – subsequently identified as Hope Romero – driving a dark blue vehicle with her two young children in the backseat.[2] Padilla flashed his emergency lights and Ms. Romero pulled her car over to the side of the road.

At this point, the parties' versions of events diverge.[3] Defendants contend that before Padilla could ascertain Ms. Romero's identity, she interrupted him to protest her innocence, became unruly, and began making hostile comments to him. According to them, in an effort to minimize any trauma to Ms. Romero's children, Padilla then ordered her to stand outside her car and only handcuffed her when she refused to calm down. Plaintiffs, however, allege that, upon pulling Ms. Romero over, Padilla immediately ordered her out of her vehicle and handcuffed

---

[2]Plaintiffs contend that police Call Card records show that officer dispatch informed Padilla that Fresquez was blonde and driving a blue Hyundai Sonata with one child inside – whereas Ms. Romero is dark-haired and was driving a blue Chevrolet Cobalt with two children inside – so that Padilla should have known Ms. Romero was not Fresquez. (Doc. 31 at 2, 11). While the alleged records were presumably produced to Plaintiffs pursuant to the limited discovery the Court allowed them for the purpose of responding to the instant motion, Plaintiffs have nevertheless failed to attach them here. Thus, Plaintiffs contention that Padilla knew that Ms. Romero did not meet the suspect's description is not properly documented and cannot be considered.

[3]The Incident Report filed by Deputy Padilla states that he did not notice that the recording device he used to record his stop was operating on low batteries, and apparently no recording of the encounter exists. (Doc. 21 Ex. C).

2

her, ignoring her requests for information and pleas that Padilla roll up her driver's side car window – which she had rolled down to speak to him when he ordered her off the road – to protect her children from the wet weather outside.  Ms. Romero maintained a calm attitude throughout the encounter, "other than being in a state of fear and shock."  (Doc. 31 at 4).   There is no dispute that Padilla handcuffed Ms. Romero before attempting to confirm her identity.

Defendants claim that after handcuffing Ms. Romero, Padilla placed her in his police vehicle, explained to her that her car matched the description of a vehicle connected to a homicide investigation, and told her that if she calmed down, he would release her from her handcuffs so she could present her identification.   Ms. Romero agreed and was permitted to produce her identification, at which point Padilla notified police dispatch that the detained woman was not Ms. Fresquez, apologized to Ms. Romero, and allowed her to go on her way.  On his return to his unit, Padilla met with officers of the New Mexico State Police who were also seeking Delilah Fresquez, and apprised them of developments involving Ms. Romero.  Because the State Police wished to make an independent verification of Ms. Romero's identity, Padilla accompanied them to her home.  There, Ms. Romero presented her identification to the state troopers, who also examined her vehicle and then left.

According to Plaintiffs, however, Ms. Romero stood handcuffed outside her car in inclement weather with Padilla and May for approximately half an hour before Padilla ever asked for her name -- during which time the officers continued to refuse to explain why she was being held, and Padilla repeatedly threatened to call the Department of Children Youth and Families and have her children removed from her custody.  At one point, Padilla ordered Ms. Romero to get inside his police SUV, but her severe rheumatoid arthritis prevented her from doing so.   Plaintiffs allege that the combined effect of Padilla's threats, Ms. Romero's  fear over

her situation, and her worry for her two young children – then aged four and one, who witnessed the incident and who Padilla refused to shield from the weather by rolling up the car window – caused Ms. Romero severe emotional distress.  Plaintiffs contend that Padilla never asked Ms. Romero to show her driver's license or vehicle registration.  The impasse only ended when, after consulting with police dispatch, Padilla finally asked Ms. Romero to state her name, address, and the name of her boyfriend, at which point he accepted her answers and let her go.  Within minutes of Ms. Romero's return to her home, Padilla arrived with a group including State Trooper Joe Chavez, who knew Ms. Romero from their school days and thus accepted her verbal self-identification.

It is undisputed that Sheriff Cordova was not personally present during any of the foregoing proceedings.

### July 2009 Arrest of Emilio Romero by Deputy Padilla

At around 10:15 p.m. on July 31, 2009, Padilla pulled over Emilio Romero while driving on State Highway 518 in northern New Mexico.  While Plaintiffs attempt to dispute Defendants' assertion that Mr. Romero's speeding led to the vehicle stop, they separately concede that the discovery already taken in the case shows that Mr. Romero was "going 4 miles per hour over the speed limit," (Doc. 31 at 14)[4], so that it is undisputed that Mr. Romero was exceeding the speed limit at the time of the stop.  According to Defendants, Padilla then ran Mr. Romero's driver's license information through the police system and, upon learning that Mr. Romero was on probation and was in violation of his probation by being out after his curfew, placed Mr. Romero

---

[4] Plaintiffs argue in opposing summary judgment that they need the opportunity for further discovery to uncover "whether Deputy Padilla routinely pulls people over for exceeding the speed limit by 4 mph or whether he was singling out" Mr. Romero.  *Id.*

under arrest and transported him back to the sheriff's department for booking.

Plaintiffs, however, contend that once Mr. Romero passed the group of police cars, they immediately began to follow him and collectively pulled him over.  This group consisted of Padilla, then-Sheriff Cordova, and then-Undersheriff Tim Marquez, all of whom Mr. Romero recognized from past incidents of police harassment.  While Plaintiffs do not dispute that it was only Padilla who approached Mr. Romero's vehicle and asked for his license and registration, they assert that Mr. Romero observed through his rearview mirror as Padilla conferred with Cordova and Marquez – without running Mr. Romero's license information through the police information system – before placing him under arrest.  The three officers then inspected Mr. Romero's vehicle before taking him to the police station.  Cordova has testified that he "assisted Deputy Padilla with doing inventory on Mr. Romero's vehicle prior to the vehicle being towed." (Doc. 21 Ex. A, Cordova Aff. ¶ 7).

Upon returning to the station, Defendants contend that Padilla contacted the judge and district attorney on call, as well as the probation officer who issued an arrest order for Mr. Romero.  While Cordova was present at the station during the time that Mr. Romero was being booked, and "left his office a few times and walked by the conference room where Mr. Romero was being booked," (Doc. 21 at 6), Defendants maintain that he was never involved in the booking process and at no time made any physical contact with Mr. Romero.  Further, Defendants state that Mr. Romero was never in Cordova's office.

Plaintiffs deny that Padilla contacted the judge and district attorney on call.[5]  They

---

[5]In their *First Supplemental Response in Opposition to Defendants' Motion for Summary Judgment on Basis of Qualified Immunity and Supporting Memorandum* (Doc. 49), Plaintiffs vigorously dispute that Padilla informed the magistrate judge and district attorney of Mr. Romero's detention.  Plaintiffs have, however, conceded that Mr. Romero *was* on probation at

contend that after the arresting order arrived by fax from Mr. Romero's probation officer, Cordova began loudly reading off the list of charges to some assembled police officers and sheriff's employees, while Mr. Romero looked on through an open door.  Cordova took issue with Mr. Romero's staring at him, and "asked [Mr. Romero] in a threatening voice, 'You got a problem with me?'" (Doc. 31 Ex. B, Emilio Romero Aff. ¶ 9).  When Mr. Romero laughed in response, Plaintiffs contend that Cordova demanded that Padilla remove his handcuffs, then put his face close to Mr. Romero's and dared Mr. Romero to hit him.  Mr. Romero attempted to back away, but Cordova grabbed his arm, and, when Mr. Romero wrested his arm back, "shouted, 'That's one count,' and pushed [Mr. Romero] back against the wall." *Id.* ¶ 10.  According to Plaintiffs, Mr. Romero fell down, righted himself, and was again pushed down by Cordova, this time against some boxes.  This happened several more times, with Mr. Romero standing back up only to be pushed down again by Cordova, "[a]nd each time it happened, Sheriff Cordova would add another number, saying, 'That's two counts, three counts, four counts of resisting arrest[].'" *Id.*  Mr. Romero then pleaded with the observing officers to re-handcuff him, and was pushed from behind by Cordova into a filing cabinet, which broke on impact.[6]  Cordova then "put [him] in a headlock and tried to put his thumb in the pressure point behind [his] ear." *Id.*  Eventually, Cordova released Mr. Romero and he was re-handcuffed for transport to the San Miguel County Detention Center.  While not all the Sheriff's department employees who, he claims, witnessed

_____

the time of his arrest, and have not challenged the validity of the arresting order issued by his probation officer.

    [6]Plaintiffs claim to have evidence supporting Mr. Romero's version of events – a photograph of the broken file cabinet that Mr. Romero took with his cell phone camera when he returned to the station following his release from the San Miguel County Detention Center, four days after his arrest.  This photograph does not appear in the record and Mr. Romero's account of the incident is not supported.

his alleged assault by Cordova were known to Mr. Romero, Plaintiffs allege that Padilla and Marquez were present for the entire episode.

### *September 2009 Traffic Citation of Emilio Romero by Sheriff Cordova*

On September 26, 2009, at 9:30 p.m, Cordova pulled over Mr. Romero as he left a church parking lot off State Road 518 in Mora County.[7]  Defendants contend that Cordova observed Mr. Romero driving so recklessly that he nearly hit another vehicle as he exited the lot, and pulled him over with the express purpose of issuing him a citation.  Cordova did not search, frisk, arrest, or incarcerate Mr. Romero pursuant to the citation, and Mr. Romero was never ordered out of the vehicle.  Defendants assert that Mr. Romero subsequently entered a plea of "no contest" to the citation and received 90 days of unsupervised probation.

Plaintiffs contend that Mr. Romero was not driving recklessly when Cordova pulled him over, but rather swerved in order to avoid broken glass on the highway.  They state that, after Cordova stopped Mr. Romero's vehicle, he demanded to know why Mr. Romero was following him.  Mr. Romero denied following Cordova, and Cordova "then tapped his gun along the side of his leg and told [Mr. Romero] that he had his friend with him."  (Doc. 31 Ex. B, Emilio Romero Aff. ¶ 15).  Mr. Romero asked Cordova if he was threatening him, and Cordova replied that he should "'[t]ake it how you want to take it.'"  *Id.*  In the portion of their brief devoted to responding to each of Defendants' proposed "undisputed material facts," Plaintiffs do not specifically controvert Defendants' assertion that Mr. Romero was not subsequently searched,

---

[7]The Complaint alleges the incident occurred "[o]n or about September 27, 2009," and asserts that it was Deputy Padilla – not Sheriff Cordova – who pulled over Mr. Romero.  (Doc. 1, Cplt. ¶ 32).  Because Plaintiffs fail to specifically controvert Defendants' account of the date and name of the officer in their response brief (*see* D.N.M. LR-civ. 56.1(b)), and, further, because the record shows that Cordova, not Padilla, issued a traffic citation to Mr. Romero (*see* Doc. 21 Ex. F), the Court deems Defendants' assertions as to the date and citing officer admitted.

frisked, or incarcerated by Cordova pursuant to the September 2009 citation, as required by
D.N.M. LR-civ.56.1(b).[8]

### November 2009 Encounter Between Emilio Romero and Sheriff Cordova

With respect to the final incident alleged in the Complaint – which describes Cordova's
unprovoked harassment and frisking of Mr. Romero in an Allsup's convenience store parking lot
on November 2009, *see infra* at 9-- Defendants make no reference to it in their proposed
undisputed facts, and appear to deny that any such encounter occurred. *See* Doc. 21 at 18
(stating that the Department "does not have any record of any encounter between Sheriff
Cordova and Mr. Romero for that date" and that the "only such occurrence took place on
September 26, 2009").

According to Plaintiffs, however, on November 18, 2009, at about 8:30 p.m., Mr.
Romero was parked outside the Allsup's in Mora while talking to a friend, Josephine Tafoya,
when Cordova pulled into the store parking lot "and shined his spotlight on [Mr. Romero's] car."
(Doc. 31 Ex. B, Emilio Romero Aff. ¶ 13).  Sitting beside Cordova in the passenger seat of his
police vehicle was RoseAnn Rodriguez, a former girlfriend of Mr. Romero who, Mr. Romero
believed, was currently in a relationship with Cordova.  Plaintiffs claim that Cordova ordered
Mr. Romero out of his truck and put his hands on his vehicle, at which point Cordova began to

---

[8]In another section of their response, however, Plaintiffs term the incident "the
September 26, 2009 arrest" of Mr. Romero, and claim that Mr. Romero made a "sworn statement
that he was held in jail for at least four days because he was on probation at the time of the
arrest." (Doc. 31 at 16-17).  *See also* Doc. 1, Cplt. ¶ 35.  The Court notes that the only testimony
from Mr. Romero that appears in the record is his affidavit attached to Plaintiffs' response brief,
which does <u>not</u> relate that he was jailed following the September 2009 vehicle stop, or describe
that stop as leading to an arrest – rather, Mr. Romero testifies that he was "released from jail[]
almost four days after" his <u>July 31, 2009 arrest</u> by Deputy Padilla.  (Doc. 31 Ex. B, Emilio
Romero Aff. ¶ 10).  Thus, the Court finds it undisputed that the September 2009 incident did not
result in an arrest.

frisk Mr. Romero roughly, "grabbing at [his] genital area[]." *Id.*  Cordova then searched Mr. Romero's vehicle, during which he accused Mr. Romero of selling drugs and announced his intention to catch him, before ultimately allowing Mr. Romero to go on his way.  Plaintiffs claim that Josephine Tafoya witnessed the entire encounter.

## PROCEDURAL HISTORY

On February 22, 2010, Plaintiffs filed a Complaint pursuant to 42 U.S.C. § 1983 in the Fourth Judicial District for the State of New Mexico, setting forth counts for unreasonable search and seizure, excessive force, and violations of Plaintiffs' rights to procedural due process and equal protection under the laws.  (Doc. 1).  Defendants removed the action to the U.S. District Court for the District of New Mexico on March 31, 2010 (*id.*), and filed an Answer on April 5, 2010 (Doc. 5).  On June 10, 2010, Defendants moved for summary judgment, arguing that they were  immune from suit in their individual capacities under the doctrine of qualified immunity. (Doc. 21).  Plaintiffs subsequently sought discovery in order to respond to the motion (Doc. 22), and U.S. Magistrate Judge Lorenzo F. Garcia granted limited discovery tailored to discrete issues relating to qualified immunity on August 13, 2010 (Doc. 23).  On September 20, 2010, Plaintiffs moved the Court for additional limited discovery, citing limited availability of the information initially sought (Doc. 31), and on October 22, 2010, Judge Garcia granted Plaintiffs' motion in part, and ordered additional discovery into, *inter alia*, the names of the judge and district attorney that Deputy Padilla's narrative report indicated he contacted before arresting Mr. Romero in July 2009 (Doc. 40).

Briefing was complete on the instant motion on September 29, 2010.  (Doc. 34).

9

However, on November 8, 2010, Plaintiffs filed – without leave of Court – a surreply brief styled "Plaintiffs' First Supplemental Response in Opposition to Defendants' Motion for Summary Judgment on [the] Basis of Qualified Immunity and Supporting Memorandum" related to the additional discovery granted by Judge Garcia.   (Doc. 49).  Defendants filed a reply to Plaintiff's supplemental response – also without leave of Court – on November 15, 2010.  (Doc. 51).

## LEGAL STANDARDS

### *Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be rendered "where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 725 (10th Cir. 2006); *see also* Fed. R Civ. P. 56(c)(2).  The moving party bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation and marks omitted).  Once this burden has been met, "the burden shifts to the nonmoving party to show that there is a genuine issue of material fact.  The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Id.  See also Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir. 1993).  It is not enough for the nonmoving party to "rest on mere allegations or denials of his pleadings" to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also West v. New Mexico Taxation and Rev. Dept.*, No. Civ. 09-0631, U.S. Dist. LEXIS 131626, at *42 (D.N.M., Oct. 31, 2010) ("[n]or can a party avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation") (internal quotation and marks

omitted). In reviewing a motion for summary judgment, the court must "examine the factual record and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1184 (10th Cir. 2010).  Its function at this stage is "not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 243.

### *Qualified Immunity*

Because a successful qualified immunity defense "generally shields from liability for civil damages government officials performing discretionary functions . . .  insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," special standards apply to the assessment of a summary judgment motion raising this defense. *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (quotation omitted); *see also Hinton v. City of Elwood*, 997 F. 2d 774, 779 (10th Cir. 1993).

In analyzing a qualified immunity defense, this Court undertakes a three-part inquiry. First, the Court must determine whether the plaintiff 's allegations, if true, establish a violation of the plaintiff's constitutional rights.  *Gomes,* 451 F.3d at 1134.  Second, if the allegations meet that standard and the analysis continues, the Court must determine "whether the law was clearly established at the time the alleged violations occurred."  *Roska v. Peterson,* 328 F.3d 1230, 1247 (10th Cir. 2003). A law is deemed clearly established "if a reasonable official in the defendant's circumstances would understand that her conduct violated the plaintiff's constitutional right." *Gomes*, 451 F.3d at 1134.  The Tenth Circuit has provided the additional guidance that, under ordinary circumstances, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains," *Tonkovich v. Kansas Board of Regents*, 159 F.3d 504, 516 (10th Cir. 1998),

11

in order for a plaintiff to demonstrate that the law was clearly established.  However, in applying

the first two prongs of the qualified immunity analysis, "[t]he judges of the district courts . . .

[are] permitted to exercise their sound discretion in deciding which of the two prongs . . . should

be addressed first in light of the circumstances in the particular case at hand." *Pearson v.

Callahan,* 129 S. Ct. 808, 818 (2009).

Finally, if the plaintiff shows that the law is clearly established, the third and final part of

the qualified immunity inquiry requires the Court to consider whether, "extraordinary

circumstances – such as reliance on the advice of counsel or on a statute – so prevented the

official from knowing that her actions were unconstitutional that she should not be imputed with

knowledge of a clearly established right." *Gomes*, 451 F.3d at 1134 (internal quotation and

marks omitted).


**DISCUSSION**

Plaintiffs' response brief does not undertake to demonstrate how their factual allegations,

if proven, would entitle them to relief.  Moreover, Plaintiffs do not set forth a theory of the case

that explains why the seemingly unrelated incidents involving *either* Hope Romero *or* Emilio

Romero and one,  the other, or both of the Defendants constitute a series of connected

transactions out of which a single suit arose.   Bearing in mind these constraints, the Court will

undertake to analyze each of Hope Romero's and Emilio Romero's claims in turn, taking the

facts in the light most favorable to them.

**I.  *Hope Romero's Constitutional Claims***

A.  Ms. Romero's Claims against Sheriff Cordova

Plaintiffs concede that Sheriff Cordova had no personal involvement in the only event at

issue involving Ms. Romero – Deputy Padilla's June 9, 2009 investigatory stop of her vehicle and the subsequent visit to her home by Padilla and the state police officers. Plaintiffs claim, however, that Cordova's involvement in the cause of action is "obvious. He reviewed the [Incident] Report and he should have known that Deputy Padilla committed numerous violations. . . . All of these violations are directly attributable to Sheriff Cordova's failure to properly train, equip, and supervise his officers." (Doc. 31 at 12). Moreover, despite their failure to dispute that Cordova "had no involvement whatsoever" in the incident in question (*see* Doc. 31 at 4; Doc. 21 at 2), Plaintiffs nevertheless intimate that Cordova's and Padilla's documented run-ins with Emilio Romero demonstrate that they "often work in close conjunction with one another," and that additional discovery is necessary to show "how closely [they] worked together regarding the arrest of Hope Romero" *Id.* at 13.

The law is clear that Plaintiffs may not maintain a § 1983 individual-capacity action against Cordova for his purported failure to properly train and/or supervise Padilla. As the Supreme Court most recently explained in *Ashcroft v. Iqbal*, "[i]n a 1983 suit . . . the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 129 S. Ct. 1937, 1949 (2009). *See also Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010) ("Just as § 1983's plain language doesn't authorize strict liability, it doesn't authorize *respondeat superior* liability. The plain language of the statute . . . asks simply whether the defendant at issue '*subjected, or caused to be subjected*' a plaintiff to a deprivation of his legal rights. To establish a violation of § 1983 by a supervisor, as with everyone else, then, the plaintiff must establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal rights") (rejecting § 1983 liability for defendant sheriff where no evidence of sheriff's direct personal responsibility

13

for plaintiff's tasing by junior officer) (internal quotation and brackets omitted); *Brocks v. Bd. of Cty. Comm'rs of Sedgwick Cty., Kansas,* 329 Fed. Appx. 200, 202 (2008) ("In an individual capacity suit, § 1983 does not recognize a concept of strict supervisor liability; the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation.") (internal quotation omitted).[9]

As to Plaintiffs' vague contention that additional discovery is needed to show how Cordova and Padilla allegedly conspired in the latter's stop of Ms. Romero's vehicle, the Court notes that Judge Garcia allowed limited discovery into any actions allegedly taken by Cordova in conjunction with the incident, including an affidavit from Ms. Romero and production of any log showing calls to Cordova by Padilla, or vice versa. *See* Doc. 26 at 5. That discovery has not yielded any evidence from which Plaintiffs have enhanced their factual allegations, and there is nothing in the record to suggest that Cordova gave any advance approval to the stop or subsequent thirty-minute detention of Ms. Romero. On the contrary, Plaintiffs have not disputed that Padilla did not make contact with Cordova during Ms. Romero's detention, as Ms. Romero's own testimony also indicates. The Tenth Circuit has held that an allegation of a sheriff's advance knowledge of the alleged constitutional violations of his subordinate, when "based on innuendo and speculation rather than fact," is insufficient to withstand summary judgment based on qualified immunity. *Porro*, 624 F.3d at 1327. Thus, Cordova is entitled to

_____

[9]Moreover, even if Plaintiffs had sued Cordova in his *official capacity* based on an alleged policy or custom of failing to train his employees – which they did not – the Tenth Circuit has held that an official-capacity §1983 claim based on an alleged failure to train employees "can be successful only if the inaction resulted from 'deliberate indifference' to the plaintiff's rights, as opposed to mere negligence. . . . One cannot be deliberately indifferent without some knowledge of the alleged situation." *Brocks,* 329 Fed. Appx. at 202. Here, Plaintiffs have not alleged that Cordova knew of Ms. Romero's vehicle stop at any point prior to or during the encounter.

summary judgment on the basis of qualified immunity on all constitutional claims arising out of the June 2009 incident involving Padilla and Ms. Romero.

B. Ms. Romero's Procedural Due Process Claim Against Padilla

The entirety of Ms. Romero's Fourteenth Amendment procedural due process allegations can be found in the statements in the Complaint that "Defendants improperly deprived Plaintiffs of their right to procedural due process" (Doc. 1 ¶ 48), and in Plaintiffs' response brief, which conclusorily states that Ms. Romero suffered a "[d]eprivation of liberty without due process of law." (Doc. 31 at 10, 17). Ms. Romero does not identify the protected interest she possessed to which due process applied, nor how she was denied the appropriate level of process by Deputy Padilla. *See Vigil v. S. Valley Acad.,* 247 Fed. Appx. 982, 990 (10th Cir. 2007) ("Procedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision. In deciding whether a plaintiff was denied procedural due process, we ask first, whether she possessed a protected interest to which due process protection was applicable; and second, whether she was afforded an appropriate level of process.").

Ms. Romero's method of pleading a due process violation is no longer sufficient following the Supreme Court's ruling in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), which mandates that the district court "look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief" in order for the complaint to survive dismissal, let alone summary judgment. *Johnson v. Bd. of Curry County Comm'rs*, 2007 U.S. Dist. LEXIS 96214, at *5-*6 , 90 Empl. Prac. Dec. (CCH) (D.N.M., Nov. 8, 2007) (internal quotation omitted). Though it is not for a court to determine at the dismissal stage "whether a claim is improbable, [it must be assured that] factual allegations in a complaint [are] enough to

15

raise a right to relief above the speculative level." *Id.* at *6 (internal quotation, marks and brackets omitted). While Plaintiffs employ the same method of asserting their other constitutional claims – reciting their factual allegations in one place, listing their counts in one another, and leaving the Court to determine the correct analysis and apply it to the facts alleged – the omission is particularly egregious on the due process count, where Plaintiffs ask the Court to speculate as to the protected interest Ms. Romero asserts and set out Plaintiffs' theory of the case for them.

Under the facts alleged, Ms. Romero was initially subjected to an investigative stop by Padilla and then forcibly restrained with handcuffs for a period of approximately half an hour. Assuming, *arguendo,* that Plaintiffs invoke procedural due process to suggest that Padilla's conduct deprived Ms. Romero of a protected liberty interest, the Court nevertheless finds that Plaintiffs have not set forth disputed facts as to either of the two elements of a procedural due process claim, and further, that Plaintiffs' allegations are more appropriately analyzed under the law of unreasonable search and seizure. "Merely stating that there was a [due process] violation is insufficient for summary judgment purposes. Furthermore, there is indication that the Fourth Amendment provides full constitutional protection for liberty interests and, as such all claims for deprivations of liberty interests [occurring at the detention stage] should be analyzed under the Fourth Amendment." *Lyles v. Burke*, 2008 U.S. Dist. LEXIS 2232, at *17-*18 (D. Colo., Jan. 10, 2008) (finding plaintiff's allegations that police deprived him of, *inter alia,* his rights to liberty and freedom from unreasonable search and seizure during an investigative stop and handcuffing, which plaintiff had characterized as a violation of procedural- and substantive due process, was more appropriately analyzed under the Fourth Amendment "objective reasonableness" test) (further citations omitted). Thus, because Plaintiffs have failed to meet the

first prong of the qualified immunity test by showing that Padilla violated Ms. Romero's

constitutional right to procedural due process, Padilla is entitled to summary judgment on this

ground.

      C.   <u>Ms. Romero's Excessive Force Claim Against Padilla</u>

A claim that a law enforcement officer used excessive force in the course of an

investigative stop is properly analyzed under the "objective reasonableness" standard of the

Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Porro*, 624 F.3d at

1325.   In determining whether the use of force is objectively reasonable, the Court must

"balance the nature and quality of the encroachment on the individual's Fourth Amendment

interests against the government's countervailing interests."  *Lundstrom v. Romero*, 616 F.3d

1108, 1126 (10th Cir. 2010).  There are "three, non-exclusive factors relevant to [an] excessive

force inquiry: [1] the severity of the crime at issue, [2] whether the suspect poses an immediate

threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or

attempting to evade arrest by flight." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir.

2009).

Plaintiffs fail to explain what part of Padilla's conduct constituted excessive force

towards Ms. Romero. The Complaint states only that "Defendants deprived Plaintiffs of their

right to be free from use of excessive force" which, Plaintiffs contend, caused them "actual

damages."  (Doc. 1, Cplt. ¶¶ 46-47).  Ms. Romero's affidavit provides some additional detail,

contending that she was handcuffed by Padilla; that her severe arthritis prevented her from

climbing inside Padilla's police SUV – though not that Padilla used any amount of force in

attempting to make her do so; and that Padilla's threats to remove her children from her custody

and refusal to apprise her of the reason for her detention caused her trauma and severe emotional

17

distress, so that she is "terribly afraid of ever driving back into Mora for fear of being stopped again," and continues to suffer nightmares about the prospect of losing her children.  (Doc. 31 Ex. A, Hope Romero Aff.¶ 16).  Ms. Romero has not testified that the handcuffs were painful or that they caused her any physical injury.

The Tenth Circuit directs "that a small amount of force . . . is permissible in effecting an arrest under the Fourth Amendment."  *Cortez v. McCauley*, 478 F. 3d 1108, 1128 (10th Cir. 2007) (en banc).  Thus, to recover on her excessive force claim, Ms. Romero "must show: (1) that [Padilla] used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional."  *Id.* at 1129 n. 25.  Here, taking Ms. Romero's allegations as true and viewing them in the light most favorable to her, she has suffered an emotional injury brought about by Padilla's  misidentification, handcuffing, and threats – *not* by his use of greater force than was reasonably necessary to effect her seizure.  Though her experience, as she relates it, was regrettably traumatic for her and her children, "not every indignity – even if it may later seem unnecessary in the peace of a judge's chambers – rises to the level of a constitutional violation."  *Silvan W. v. Briggs*, 309 Fed. Appx. 216, 224 (10th Cir. 2009) (finding no excessive force where plaintiff was handcuffed for above an hour "in full view of neighbors, friends, and others," resulting in sore, painful wrists and "extreme emotional trauma") (internal quotation omitted); *see also Smith v. Kenny*, 678 F. Supp. 2d 1124, 1164 (D.N.M. 2009) (plaintiffs initially suspected of involvement in homicide investigation and subsequently held in handcuffs for forty-five minutes did not make out an excessive force claim)  Thus, because Plaintiffs have failed to meet the first prong of the qualified immunity test by showing that Padilla violated Ms. Romero's constitutional right to freedom from excessive force, Padilla is entitled to summary

judgment on this ground.

D.  <u>Ms. Romero's Claims for Unreasonable Search and Seizure Against Padilla</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const, amend. IV. These protections are incorporated into the Fourteenth Amendment, and thus apply to state law enforcement officials just as they do to federal officials.  *See California v. Minjares*, 443 U.S. 916, 921 (1979). While Plaintiffs set forth separate counts for "unreasonable search" and "unreasonable seizure," at no point do they allege that Ms. Romero was searched by Deputy Padilla.  Padilla is thus entitled to summary judgment on her "unreasonable search" claim.

As to Ms. Romero's "unreasonable seizure" claim, the Court recognizes two types of seizures -- arrests, which must be supported by probable cause, and investigatory stops, which need only be supported by reasonable suspicion of criminal activity.  *See Sisneros v. Fisher*, 685 F. Supp. 2d 1188, 1203 (D.N.M. 2010), citing *Terry v. Ohio*, 392 U.S. 1 (1968); *see also Cortez*, 478 F.3d at 1115 ("An officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.") (internal quotation omitted).  In order for an officer to have reasonable suspicion to seize an individual for purposes of an investigatory stop, "the officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Cortez*, 478 F.3d at 1115.  Thus, reasonable suspicion "may not be derived from inchoate suspicions and unparticularized hunches."  *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005).  The Court must consider the totality of the circumstances in determining "whether the officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  *Cortez*, 478 F.3d at 1123.

19

If a law enforcement officer exceeds the permissible scope of an investigatory stop, however, the stop is transformed in the court's analysis into an arrest requiring application of the more stringent "probable cause" standard to the officer's conduct.  *See Sisneros*, 685 F. Supp. 2d at 1216 (resolving factual dispute in favor of non-movant plaintiff – who denied yelling, making physical contact, and displaying the aggressive body language that formed the basis of defendant's purported reasonable suspicion – and finding that lack of aggravated circumstances transformed plaintiff's seizure at gunpoint into a full-blown arrest); *United States v. Place*, 462 U.S. 696, 710 (1983) (seizure of plaintiff's luggage was transformed into seizure requiring probable cause at some point over the ninety minutes the luggage was in officer's possession). The Tenth Circuit has held that a police officer's use of handcuffs and other forceful techniques generally exceeds the scope of an investigative detention and is "justified only by probable cause or when the circumstances reasonably warrant such measures."  *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998) (internal quotation omitted).  However, "[t]here are no hard-and-fast rules regarding the reasonableness of force used during investigatory stops . . . because safety may require the police to freeze temporarily a potentially dangerous situation, both the display of firearms and the use of handcuffs may be part of a reasonable *Terry* stop." *United States v. Merkley,* 988 F.2d 1062 (10th Cir. 1993) (use of handcuffs and display of firearms was reasonable and did not transform investigative stop into arrest where suspect threatened to kill someone and was behaving violently).  Further, "it is the totality of the circumstances, not strictly duration, that makes an arrest."  *Sisneros*, 685 F. Supp. 2d at 1206 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

The Court finds that genuine and material issues exist regarding the basis of Padilla's detention of Ms. Romero.  Taking the Plaintiffs' allegations as true, and viewing the evidence in

the light most favorable to them, it appears that Ms. Romero was (1) pulled over at night while

obeying the rules of the road; (2) ordered out of her car without an explanation as to why she

was being detained; (3) handcuffed, despite the fact that she was calm and cooperative; (4)

repeatedly threatened with the removal of her children from her custody, within hearing of her

children, and without knowing why; (5) ordered to sit in the back of Padilla's patrol vehicle

(though she could not sit down, due to a physical impairment); and (6) made to stand outside in

inclement weather for approximately half an hour before having the situation explained to her

and given an opportunity to identify herself.

    Here, the totality of the circumstances at issue, as pled by Plaintiffs, demonstrates that

Ms. Romero was treated as an arrestee, not merely a detainee to an investigatory stop.   Padilla

may have initially had cause to pull over Ms. Romero's car on the reasonable suspicion that – by

simple virtue of being a woman driving a blue compact car in the vicinity of Delilah Fresquez'

home – Ms. Romero *was* Fresquez, a witness stopped for questioning "related to a current and

ongoing criminal investigation involving a homicide," in Defendants' careful turn of phrase,

who had subsequently fled the scene.  (Doc. 21 at 3).  However, Defendants have not alleged

that Fresquez was herself wanted for murder[10] and/or believed to be armed and dangerous.  *See*

*United States v. Melendez-Garcia*, 28 F.3d 1046, 1052-53 (10th Cir. 1994) (treating stop as an

arrest requiring a show of probable cause where "there was no evidence or testimony from the

police that they had reason to believe these particular suspects had guns or were violent or that

the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing

---

[10]Indeed, Defendants term Fresquez a "subject" in their ongoing investigation, not a
suspect in a crime, in various places throughout the briefing.  *See, e.g.*, Doc. 21 at 12, 13, 14, 22,
23; Doc. 34 at 7.

the defendants during the *Terry* stop).  Thus, Padilla's forcible restraints on Ms. Romero and repeated threats to her elevated their encounter from an investigatory stop into an arrest requiring probable cause to save it from illegality.  "[I]n the Tenth Circuit, there must be something more than the fact that the underlying crime was violent to justify officers' use of handcuffs and/or handguns during an investigative detention.  Without such an additional justification, the . . . handcuffs transform that investigative detention into an arrest."  *Sisneros,* 685 F. Supp. 2d at 1207.

Under the view of the case set forth by Plaintiffs, Padilla lacked probable cause to arrest a compliant Ms. Romero without first giving her the opportunity to identify herself.  Defendants claim that Padilla "had probable cause, or at the very least, arguable probable cause" to arrest Ms. Romero in light of Padilla's testimony as to her unruliness and the fact that "[u]ntil he determined her true identity, it was possible that she was the female subject who fled another police officer who was investigating a murder."  (Doc. 21 at 14).  The Court finds, however, that the mere fact that "it was possible*"* that Ms. Romero was Fresquez is insufficient to justify the unprovoked handcuffing, threats, and half-hour delay she allegedly endured before Padilla permitted her to confirm her true identity.  "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  *Cortez*, 478 F.3d at 1115-1116. Here, the only facts and circumstances within Padilla's knowledge suggesting that Ms. Romero was "the subject" of his search were her gender and the fact that she was driving a blue, compact vehicle.  As Padilla would not have had probable cause to handcuff, threaten, and detain every female meeting that description in the vicinity, the Court finds that a reasonable jury could

accept Plaintiffs' version of events and find that Ms. Romero's Fourth Amendment protection from unreasonable seizure was violated.

The final burden Plaintiffs must meet in order to withstand Padilla's assertion of qualified immunity is to demonstrate that the right Ms. Romero has asserted – the right to be free from seizure in the absence of probable cause or reasonable suspicion – was clearly established at the time of the alleged violation. *See supra* at 12-23; *Gomes*, 451 F.3d at 1134. Plaintiffs easily meet this burden. "The rights to be free from seizure in the absence of probable cause or reasonable suspicion is beyond question." *Sisneros,* 685 F. Supp. 2d at 1219 (further citations omitted). Consequently, the case law of this Circuit "define[s] the scope of reasonable police conduct to an extent that no reasonable officer, behaving in the way that [Ms. Romero] alleges [Deputy Padilla] acted, could believe that his conduct was lawful." *Id.* at 1219-20 (denying summary judgment of qualified immunity as to plaintiff's unreasonable seizure claim where genuine factual dispute existed and law was clearly established). Thus, the Court will deny Defendants' motion for summary judgment as to Ms. Romero's Fourth Amendment "unlawful seizure" claim.

E. <u>Ms. Romero's Equal Protection Claim Against Padilla</u>

Finally, Ms. Romero contends that she was denied equal protection under the laws as a result of her vehicle stop by Deputy Padilla. The Fourteenth Amendment mandates that "no State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. "Equal protection is essentially a direction that all persons similarly situated should be treated alike." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008). "In order to assert a viable equal protection claim, plaintiff[] must first make a threshold showing that [she was] treated differently from others who

were similarly situated to [her]." *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998).

Construing the Complaint liberally, as it is obligated to do, the Court finds that Plaintiffs fail to

make any specific allegations as to Ms. Romero's discriminatory treatment by Padilla, or to

explain how Ms. Romero was treated differently from any similarly situated person(s).  On the

contrary, the only reference to Plaintiffs' equal protection claim in the Complaint is the

conclusory statement that "Defendants improperly deprived Plaintiffs of their right to equal

protection under the laws."  (Doc. 1, Cplt. ¶ 52).  In their response brief, Plaintiffs intimate that

Padilla "knew or should have known" that Ms. Romero was not the suspect he was seeking at the

time he pulled over her vehicle, (Doc. 31 at 11) – but do not set forth specific allegations as to

how Padilla's conduct amounted to discrimination. Moreover, Plaintiffs fail to even identify the

protected class of which they claim Ms. Romero is a member.[11]  Without such information, Ms.

Romero fails to state an equal protection claim, and thus to meet the first prong of the qualified

immunity test.  Defendants are therefore entitled to summary judgment on the basis of qualified

immunity on this additional ground.

---

[11]Plaintiffs' act of combining their claims (which they at no point argue are related in time, space, or origin)  into a single suit would seem to suggest that they mean to proceed under a "class of two" theory of equal protection  – and thus allege that the relationship between their claims is a motivation on the part of the Defendants to harass the Romero siblings.  *See Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing equal protection claims successfully "brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no basis for the difference in treatment").  Plaintiffs, however, never support the vague impression left by their Complaint with an explicit allegation describing the nature of the "bias" and "improper motive" they attribute to Defendants.  (Doc. 31 at 10).  Without any allegation that Defendants targeted the Romeros collectively, or alternatively, that Padilla pulled over her vehicle with the intent of discriminating against her, Ms. Romero cannot make out a "class of two" or "class of one" equal protection claim.

## II. *Mr. Romero's Constitutional Claims*

### A. Mr. Romero's Procedural Due Process Claims Against Cordova and Padilla

Plaintiffs' allegation that Emilio Romero's Fourteenth Amendment procedural due process rights were violated by Defendants suffers from the same critical defects as do their due process allegations with respect to Hope Romero – namely, that they fail to identify the protected interest(s) Mr. Romero possessed to which due process protection was applicable and to allege that he was afforded less than the appropriate level of process. *See supra*, at 16-17. Because Plaintiffs have not made out allegations supporting either element of the two-part procedural due process analysis with regard to Mr. Romero – and thereby fail to state a viable claim that Mr. Romero's constitutional right to procedural due process was violated, as required by the first prong of the qualified immunity test – Defendants are entitled to summary judgment on this ground. *See Lyles*, 2008 U.S. Dist. LEXIS 2232, at *17-*18.

### B. Mr. Romero's Excessive Force Claims Against Cordova and Padilla

The summary judgment record contains no allegation that Deputy Padilla used excessive force against Mr. Romero in placing him under arrest on the one occasion they are alleged to have interacted, July 31, 2009.  Padilla is thus entitled to summary judgment on this portion of Mr. Romero's excessive force claim.

Mr. Romero has testified as to two separate incidents that could give rise to a claim of excessive force against Sheriff Cordova – one occurring post-arrest, and the other occurring pursuant to an encounter that did not lead to either a detention or an arrest.  Because Mr. Romero was in two different places in the criminal justice system when the force allegedly occurred, the Court must apply different excessive force analyses to the two incidents. With respect to the former incident,  Mr. Romero alleges that on July 31, 2009, he was battered by Cordova in the

Sheriff's Office after he was arrested and booked, but before he was transported to the county detention center, a factual scenario that mandates application of a three-factor due process analysis focusing on: "(1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor."  *Porro*, 624 F.3d at 1326 (holding that "when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment" a due process analysis applies to his excessive force claim).  With respect to the latter incident, Mr. Romero alleges that on November 18, 2009, Cordova forcibly grabbed his genitals during an encounter in a convenience store parking lot, a factual scenario that mandates a Fourth Amendment "objective reasonableness" analysis. *See Graham*, 490 U.S. at 388; *Porro*, 624 F.3d at 1325 ("because the Fourth Amendment protects against 'unreasonable searches and seizures' and pertains to the events leading up to and including an arrest of a citizen previously at liberty, excessive force claims arising during this period are generally reviewed under a relatively exacting 'objective reasonableness' standard.").

     1. *The July 2009 Incident*

Mr. Romero alleges that after his July 31 arrest Cordova grabbed his arm and pushed him against a wall of the Sheriff's Office with sufficient force that he fell to the ground; pushed him back down to the ground four more times; pushed him from behind into a filing cabinet, which subsequently broke; and "put [him] in a headlock and tried to put his thumb in the pressure point behind [his] ear."  (Doc. 31 Ex. B, Emilio Romero Aff. ¶ 10).  However, the only two references to any injury suffered by Mr. Romero as a result of Cordova's conduct are the generic comment in Plaintiffs' response brief that "Sheriff Roy Cordova assaulted and battered [Mr. Romero] causing injury to [him]" (Doc. 31 ¶¶ 15-16), and Hope Romero's testimony in her affidavit that

she could "recall a time when [her] brother was out past his probation curfew and was immediately arrested almost as soon as he crossed over the Mora County line.  That was the time he had to go to the hospital after getting roughed up by the Mora County Sheriff's Department." (Doc. 31 Ex. A, Hope Romero Aff. ¶ 18).  It is unclear whether Ms. Romero refers to the July 31 arrest (which was made pursuant to Mr. Romero's violating his probation curfew), as she did not testify as to the date of the alleged "roughing up" of Mr. Romero, and there are no other references to Mr. Romero's purported hospitalization anywhere in the record.[12]

Applying the three-factor due process analysis under *Porro* to Mr. Romero's factual allegations and accepting those allegations as true for purposes of resolving the instant motion, it is clear that the first factor – the relationship between the amount of force allegedly used by Cordova and the need presented – does not favor Defendants.  Under Mr. Romero's version of events, Cordova had no need to use physical force against Mr. Romero.  Indeed, the allegations are that he ordered a subdued and compliant Mr. Romero removed from his handcuffs with the express purpose of repeatedly shoving him and placing him in a headlock.  As to the second factor, however, Mr. Romero fails to assert the nature or extent of his injury, and merely states the bare allegation that an "injury" was inflicted by Cordova.  The Tenth Circuit has "consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury when bringing excessive force claims."  *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1208 (10th Cir.

---

[12]Indeed, Mr. Romero's own testimony suggests that he was <u>not</u> hospitalized directly following the incident, as he testifies that after Cordova released him from the headlock, he was transported to the San Miguel County Detention Center, where he remained for "almost four days," following which he "returned to the police station after [he] was eventually released from jail," in order to photograph the broken file cabinet for evidentiary purposes (though the photograph is not in the record, for reasons Plaintiffs fail to explain).  (Doc. 31 Ex. B, Emilio Romero Aff. ¶ 10).

2008), citing *Holland ex rel. Overdoff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001).

What the Tenth Circuit "do[es] require, though, is actual harm[,] whether it be 'physical or

emotional,'" *Fisher*, 584 F.3d at 898, as "the absence of injury in the context of the totality of

the circumstances may suggest the absence of excessive force." *Cortez*, 478 F.3d at 1129 n. 24

(rejecting excessive force claim because plaintiff's injury, which happened to be physical, was

de minimis). Here, the Court has combed over Mr. Romero's affidavit and the rest of the

summary judgment record in vain for any evidence of actual harm – whether physical or

emotional -- he suffered as a result of the July 2009 incident. Given that Mr. Romero was

permitted by Judge Garcia to conduct limited discovery tailored to defeating Defendants'

qualified immunity motion, his failure to testify as to any actual harm he suffered or proffer any

record of the hospitalization to which his sister's affidavit obliquely refers – indeed, his failure to

do anything more than generically recite that he suffered an "injury" in his response brief – is

fatal on summary judgment. *See Sisneros v. Fisher,* 685 F. Supp. 2d 1188, 1208 (D.N.M. 2010)

("The cases [of the Tenth Circuit] make clear that 'actual injury' . . . is required to sustain a

claim of excessive use of force."). Because Mr. Romero cannot state a claim for excessive force

based on the July 2009 incident in the absence of an actual injury, the Court need not consider

Cordova's motives under the third *Porro* factor, and Plaintiffs fail to meet the first prong of the

qualified immunity analysis.

   2. *The November 2009 Incident*

   Likewise, with respect to the alleged November 2009 incident, Mr. Romero has testified

that Cordova "frisked [him] quite roughly, grabbing at [his] genital areas," (Doc. 31 Ex. B,

Emilio Romero Aff. ¶ 13), but not that he suffered any actual harm on account of Cordova's

actions. Though Mr. Romero's allegations with respect to this episode are subject to a Fourth

Amendment "objective reasonableness" inquiry, Mr. Romero is still required to plead an actual injury in order to withstand summary judgment on his excessive force claim, regardless of the amendment at issue.  *See, e.g., Cortez*, 478 F.3d at 1128-29 (applying "actual harm" requirement under "objective reasonableness" analysis); *Holland,* 268 F.3d at 1192-93 (same).

The Tenth Circuit has held that an injury to a plaintiff's sense of personal dignity comes within the protection of a Fourth Amendment excessive force claim, a prospect that might *theoretically* apply to the kind of unprovoked frisking Mr. Romero describes.  "The interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property and privacy interests – a person's 'sense of security' and individual dignity."  *Holland*, 268 F.3d at 1195 (finding that police officers' detainment of plaintiffs, including children, at gunpoint was excessive use of force, despite plaintiffs' failure to allege any physical injuries).  However, the Court cannot infer that Mr. Romero suffered an injury to his personal dignity where he does not claim that one occurred.  Mr. Romero's failure to allege any actual harm suffered on account of Cordova's conduct is thus fatal to this additional portion of his excessive force claim, ensuring that Plaintiffs fail to meet the first prong of the qualified immunity analysis and that Defendants are entitled to summary judgment on both portions of his excessive force claims.

C. Mr. Romero's Claims for Unreasonable Search and Seizure Against Cordova and Padilla

Plaintiffs fail to explain which of Mr. Romero's three encounters (the July 2009 arrest, September 2009 citation, or November 2009 frisking) with one or both Defendants purportedly violated his Fourth Amendment right to be free from unreasonable search and seizure. Considering the incidents chronologically, the Court finds that Plaintiffs have failed to assert an

"unreasonable search" or "unreasonable seizure" claim with respect to the first incident, Mr. Romero's July 2009 arrest by Deputy Padilla and the subsequent search of his vehicle by both Defendants.  Plaintiffs concede that discovery already taken in this case shows that Mr. Romero was in fact "going 4 miles per hour over the speed limit" (Doc. 31 at 14), which gave Padilla reasonable cause to stop his vehicle.  While Plaintiffs dispute Padilla's testimony that he ran Mr. Romero's information through the police system and learned he was on probation before effecting his warrantless arrest – citing Mr. Romero's opinion that Padilla would not have had time to run his license through the police system in the time that he was at his police vehicle and presumably out of Mr. Romero's field of vision – there is no dispute that Mr. Romero was, in fact, on probation at the time.  Indeed, Plaintiffs have not challenged the validity of the arrest order Padilla obtained from Mr. Romero's probation officer upon their return to the sheriff's office.  Thus, even assuming, as Plaintiffs imply, that it was actually Sheriff Cordova who advised Padilla to arrest Mr. Romero and take him back to the sheriff's office, Plaintiffs acknowledge that Cordova and Mr. Romero have a long and colorful history, and "probable cause for an arrest may be based on the collective knowledge of the police."  *United States v. Merritt*, 695 F.2d, 1263, 1268 n.9 (10th Cir. 1982).  In light of these circumstances, the Court does not find that Mr. Romero's estimate of the time it took Padilla to effect his arrest creates a material factual dispute as to the legality of his seizure.

Second, with respect to Cordova's September 2009 citation of Mr. Romero for careless driving, it is undisputed that Mr. Romero was not searched or seized pursuant to the encounter.

With respect to the third and final encounter alleged to have occurred between Mr. Romero and either of the Defendants – Mr. Romero's forcible frisking by Cordova in an Allsup's parking lot in November 2009 – the Court finds that a genuine issue of material fact

30

exists.  At the time of the alleged encounter, Cordova was driving his police vehicle but riding with his girlfriend (a former girlfriend of Mr. Romero) beside him in the passenger seat. According to Plaintiffs, Mr. Romero was seated in his truck and chatting with a female friend when Cordova pulled into the parking lot and, without prelude, ordered him out of the truck and made him put his hands on the vehicle while Cordova "frisked [him] quite roughly, grabbing at [his] genital areas," and then searched his truck.  (Doc. 31 Ex. B, Emilio Romero Aff. ¶ 13). Cordova then "insinuated that [Mr. Romero] was selling drugs" and confirmed that he would catch him, before allowing Mr. Romero to leave.  *Id.*

In response, Defendants claim that the Department does not have a record of any such incident occurring on November 18, 2009 and suggest that Plaintiffs confuse or conflate their allegations with respect to this incident with their allegations with respect to Mr. Romero's September 2009 careless driving citation of Mr. Romero, which also took place in the vicinity of the Allsup's store.  *See* Doc. 21 at 18 ("The only such occurrence took place on September 26, 2009 at about 9:30 p.m. . . .").   Defendants' contentions do not suffice to carry their burden of showing an absence of evidence to support Mr. Romero's version of events – rather, they show the existence of a genuine issue of material fact.  Construing all evidence in the light most favorable to Mr. Romero and resolving any doubt as to the number of encounters in the light most favorable to him, it is clear that Mr. Romero has testified as to both a search and a seizure that were not, in his telling, justified by any reasonable suspicion on Cordova's part.  *See Sisneros*, 685 F. Supp. 2d at 1203 ("'a person has been seized within the meaning of the Fourth Amendment only if, in view of all of circumstances surrounding the incident, a reasonable person would have believed he was not free to leave'") (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  Thus, the Court finds that Plaintiffs have set forth factual allegations

31

that could result in a reasonable jury returning a verdict that Cordova violated Mr. Romero's rights to freedom from both "unreasonable search" and "unreasonable seizure" pursuant to the alleged November 2009 encounter. Moreover, for the reasons discussed above in relation to Ms. Romero's claim for unreasonable seizure against Deputy Padilla, (*see supra* at 23), the Court finds that the law protecting an investigative detainee from unreasonable search and seizure is clearly established and would have been known to Sheriff Cordova at the time of the alleged violation. *See Sisneros,* 685 F. Supp. 2d at 1219 ("The rights to be free from seizure in the absence of probable cause or reasonable suspicion is beyond question.") (further citations omitted). Cordova's motion for summary judgment on the basis of qualified immunity based on the events of November 18, 2009 is therefore denied.

     D.   <u>Mr. Romero's Equal Protection Claims Against Cordova and Padilla</u>

     Finally, Mr. Romero fails to put forth any facts supporting an equal protection claim against either Defendant. He does not identify the protected class of which he is a member and makes "no allegation that he was treated differently than any similarly situated person." *Muller v. Culbertson*, 2011 U.S. App. LEXIS 2049, at *4 (10th Cir., Feb. 11, 2011). *See discussion, supra*, at 25-26. Because Mr. Romero cannot meet the first prong of the qualified immunity analysis by establishing a violation of his equal protection rights, Defendants are thus entitled to summary judgment on his equal protection claim.

<strong>CONCLUSION</strong>

     For the foregoing reasons, it is therefore ordered that Defendants' *Motion for Summary Judgment on the Basis of Qualified Immunity* (Doc. 21) is granted in part and denied in part as follows:

32

1.  As to Hope Romero's claim for procedural due process against Sheriff Cordova, Defendants' motion is GRANTED.

2.  As to Hope Romero's claim for procedural due process against Deputy Padilla, Defendants' motion is GRANTED.

3.  As to Hope Romero's claim for excessive force against Sheriff Cordova, Defendants' motion is GRANTED.

4.  As to Hope Romero's claim for excessive force against Deputy Padilla, Defendants' motion is GRANTED.

5.  As to Hope Romero's claim for unreasonable search against Sheriff Cordova, Defendants' motion is GRANTED.

6.  As to Hope Romero's claim for unreasonable search against Deputy Padilla, Defendants' motion is GRANTED.

7.  As to Hope Romero's claim for unreasonable seizure against Sheriff Cordova, Defendants' motion is GRANTED.

8.  As to Hope Romero's claim for unreasonable seizure against Deputy Padilla, Defendants' motion is DENIED.

9.  As to Hope Romero's claim for equal protection against Sheriff Cordova, Defendants' motion is GRANTED.

10. As to Hope Romero's claim for equal protection against Deputy Padilla, Defendants' motion is GRANTED.

11. As to Emilio Romero's claim for procedural due process against Sheriff Cordova, Defendants' motion is GRANTED.

12. As to Emilio Romero's claim for procedural due process against Deputy Padilla, Defendants' motion is GRANTED.

13. As to Emilio Romero's claim for excessive force against Sheriff Cordova, Defendants' motion is GRANTED.

14. As to Emilio Romero's claim for excessive force against Deputy Padilla, Defendants' motion is GRANTED.

15. As to Emilio Romero's claim for unreasonable search against Sheriff Cordova, Defendants' motion is DENIED with respect to the events of November 18, 2009.

16.     As to Emilio Romero's claim for unreasonable search against Deputy Padilla, Defendants' motion is GRANTED.

17.     As to Emilio Romero's claim for unreasonable seizure against Sheriff Cordova, Defendants' motion is DENIED with respect to the events of November 18, 2009.

18.     As to Emilio Romero's claim for unreasonable seizure against Deputy Padilla, Defendants' motion is GRANTED.

19.     As to Emilio Romero's claim for equal protection against Sheriff Cordova, Defendants' motion is GRANTED.

20.     As to Emilio Romero's claim for equal protection against Deputy Padilla, Defendants' motion is GRANTED.


**UNITED STATES DISTRICT JUDGE**